## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

RAFAEL MURREY,

      Defendant.

Case No. 09-cr-20473

Hon. Victoria A. Roberts

**Oral Argument Requested**

---

| | |
|---|---|
| Andrew J. Lievense | Wade G. Fink (P78751) |
| Assistant United States Attorney | WADE FINK LAW PC |
| 211 W. Fort Street, Suite 2001 | 370 E. Maple Rd., Third Floor |
| Detroit, MI 48226 | Birmingham, Michigan 48009 |
| (313) 226-9665 | (248) 712-1054 |
| andrew.lievense@usdoj.gov | wade@wadefinklaw.com |
| *Attorney for the United States* | *Attorneys for Rafael Murrey* |

---

### <u>EMERGENCY MOTION FOR COMPASSIONATE RELEASE</u>

Defendant Rafael Murrey ("Murrey"), through counsel, WADE FINK LAW, P.C., moves this Court for an order reducing his sentence and releasing him from prison under the compassionate release provisions of 18 U.S.C. § 3582, as modified by the First Step Act. Murrey has several CDC-recognized risk factors which heighten his vulnerability to serious complications should he contract COVID-19. Additionally, USP Yazoo City, where Murrey was recently transferred, is currently reporting a large outbreak of COVID-19.

The undersigned sought concurrence on this motion on December 1, 2020 by e-mail. Concurrence was denied on December 2, 2020.

Date:  December 3, 2020

Respectfully Submitted,

WADE FINK LAW P.C.

/s/ Wade G. Fink
Wade G. Fink (P78751)
*Attorneys for Defendant*
370 E. Maple Rd., Third Floor
Birmingham, MI 48009
248-712-1054
wade@wadefinklaw.com

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.

RAFAEL MURREY,

     Defendant.

Case No. 09-cr-20473

Hon. Victoria A. Roberts

**Oral Argument Requested**

---

| | |
|---|---|
| Andrew J. Lievense | Wade G. Fink (P78751) |
| Assistant United States Attorney | WADE FINK LAW PC |
| 211 W. Fort Street, Suite 2001 | 370 E. Maple Rd., Third Floor |
| Detroit, MI 48226 | Birmingham, Michigan 48009 |
| (313) 226-9665 | (248) 712-1054 |
| andrew.lievense@usdoj.gov | wade@wadefinklaw.com |
| *Attorney for the United States* | *Attorneys for Rafael Murrey* |

---

## BRIEF IN SUPPORT EMERGENCY MOTION
## FOR COMPASSIONATE RELEASE

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES**……………………………………………………iii

**STATEMENT OF ISSUES**………………………………….…..…………...vi

**I.    INTRODUCTION AND FACTUAL BACKGROUND**…...……..……..1

**II.    ARGUMENT**……………………………………….....…………..………3

      A.    THE PRISON SETTING COMBINED WITH MURREY'S UNDERLYING HEALTH CONDITIONS CONSTITUTES A COMPELLING AND EXTRAORDINARY CIRCUMSTANCE WARRANTING RELEASE…………………………………………3

          1.    Communal Prison Confinement Inherently Increases Inmates' Vulnerability to COVID-19…………………………………………...5

          2.    Murrey Has Conditions Which the CDC Explicitly Recognizes as Risk Factors for Severe Illness……………………………………11

      B.    A SENTENCE REDUCTION IS ALSO CONSISTENT WITH THE SENTENCING COMMISSION'S POLICY STATEMENTS AND THE FACTORS OUTLINED IN § 3553(a)…………………………19

          1.    The Court Skips Consideration of U.S.S.G. § 1B1.13(2)……..19

          2.    § 3553(a) Factors…………………………………………...20

**III.    CONCLUSION**……………………………………………………………26

ii

# TABLE OF AUTHORITIES

## Cases

*Cotton v. United States*, No. 16-20222-8, 2020 U.S. Dist. LEXIS 112198 (E.D. Mich. June 26, 2020) …………………………………………………………...10

*In re Manrique,* No. 19-mj-71055-MAG-1 (TSH), 2020 U.S. Dist. LEXIS 50017 (N.D. Cal. Mar. 19, 2020) ………………………………………………………..8

*Tyler v. United States*, No. 4:12-cr-37, 2020 U.S. Dist. LEXIS 171702 (E.D. Va. Sep. 18, 2020) ………………………………………………………………..21

*United States v. Alam*, 960 F.3d 831 (6th Cir. 2020) ……………………………3, 4

*United States v. Alam*, No. 15-20351, 2020 U.S. Dist. LEXIS 130118 (E.D. Mich. July 23, 2020) ………………………………………………………………..22

*United States v. Atwi*, No. 18-20607, 2020 U.S. Dist. LEXIS 68282 (E.D. Mich. Apr. 20, 2020) …………………………………………………………………...9

*United States v. Collins*, No. 10-cr-00963-1, 2020 U.S. Dist. LEXIS 121398 (N.D. Ill. July 10, 2020) ……………………………………………………………….17

*United States v. Colvin*, No. 3:19-cr-179, 2020 U.S. Dist. LEXIS 57962 (D. Conn. Apr. 2, 2020) …………………………………………………………………...15

*United States v. Cummings*, No. 12-CR-445-14 (JMF), 2020 U.S. Dist. LEXIS 103931 (S.D.N.Y. June 10, 2020) ………………………………………………23

*United States v. Gallman*, No. 14-cr-292-PWG-1, 2020 U.S. Dist. LEXIS 108762 (D. Md. June 22, 2020) ……………………………………………………………18

*United States v. Gardner*, No. 14-CR-20735-001, 2020 U.S. Dist. LEXIS 129160 (E.D. Mich. July 22, 2020) ………………………………………………………..22

*United States v. Glover*, No. 07-cr-00152, 2020 U.S. Dist. LEXIS 152064 (D. D. C. Aug. 21, 2020) ……………………………………………………………….17

*United States v. Goins*, No. 11-cr-20376, 2020 U.S. Dist. LEXIS 100358 (E.D. Mich. June 9, 2020) …………………………………………………………………...18

*United States v. Gonzalez*, No. 13-CR-101-JPS, 2020 U.S. Dist. LEXIS 137372 (E.D. Wis. Aug. 3, 2020) ………………………………………………………….18

*United States v. Grimm*, No. 2:08-CR-64 JCM (GWF), 2020 U.S. Dist. LEXIS 94683 (D. Nev. May 29, 2020) ………………………………………………………18

*United States v. Haynes*, No. 14-20083, 2020 U.S. Dist. LEXIS 145107 (E.D. Mich. Aug. 13, 2020) …………………………………………………………………17

*United States v. Hooker*, 2020 U.S. Dist. LEXIS 141626 (S.D.N.Y. Aug. 3, 2020) ………………………………………………………..23

*United States v. Jackson*, No. 18-CR-5477-GPC, 2020 U.S. Dist. LEXIS 114706 (S.D. Cal. June 22, 2020) ……………………………………………………….16

*United States v. Jones*, _ F.3d _ (6th Cir. Nov. 20, 2020) ………………………4, 19

*United States v. Lewis*, No. 16-cr-302, 2020 WL 2081374 (S.D.N.Y. Apr. 30, 2020) ……………………………………………………….15

*United States v. Locke*, No. CR18-0132 RAJ, 2020 U.S. Dist. LEXIS 102592 (W.D. Wash. June 11, 2020) ……………………………………………………………..23

*United States v. Lopez*, 2020 U.S. Dist. LEXIS 106989 (S.D.N.Y. June 15, 2020) …………………………………………………………23

*United States v. Meron*, No. 2:18-cr-0209-KJM, 2020 U.S. Dist. LEXIS 161711 (E.D. Cal. Sep. 2, 2020) …………………………………………………………...18

*United States v. Muniz*, No. 4:09-CR-0199-1, 2020 U.S. Dist. LEXIS 59255 (S.D. Tex. Mar. 30, 2020) …………………………………………………………………11

*United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 U.S. Dist. LEXIS 58718 (E.D. Pa. Apr. 1, 2020) ………………………………………………………..11, 21

*United States v. Sawicz*, No. 08-cr-287 (ARR), 2020 U.S. Dist. LEXIS 64418 (E.D.N.Y. Apr. 10, 2020) …………………………………………………………21

*United States v. Turner*, No. 18-CR-142, 2020 U.S. Dist. LEXIS 175572 (E.D. Wis. Sep. 24, 2020) …………………………………………………………………………..22

*United States v. Wren*, No. 10-cr-20137, 2020 U.S. Dist. LEXIS 156155 (E.D. Mich. Aug. 28, 2020) …………………………………………………………………………22

## STATEMENT OF ISSUES

1.     Has Murrey demonstrated a compelling and extraordinary circumstance warranting compassionate release in light of his incarceration, age, obesity, diabetes, consumption of immune-suppressive medication, and the particularly dangerous situation at USP Yazoo City prison, all of which heighten his risk of developing life-threatening complications should he contract COVID-19?

Murrey answers, yes.

2.     Has Murrey demonstrated that a reduction in his sentence would be consistent with the Section 3553(a) factors?

Murrey answers, yes.

## I.     <u>INTRODUCTION AND FACTUAL BACKGROUND</u>

Murrey is a 49-year-old man currently incarcerated at a high security facility - USP Yazoo City - not because of his dangerousness, but to reduce crowding at the satellite camp where he was previously housed - FMC Lexington. Murrey was primarily raised by his mother, Lorey Bray, and had very little contact with his father. Murrey's mother is a teacher and his stepfather works at Chrysler Corporation. Murrey's sister is employed as a school principle. Murrey is a lifelong Michigan resident and is married to the same woman who he met 20 years ago – Shanier Murrey. Murrey and Shanier have one child – Rafael Jr. – who is seven years old. Ray Jr. lives with his mother in Bloomfield Hills, Michigan. Probation reported that Murrey "played a significant role" in the upbringing of his stepson, who is now 22. *See* PSI.

On September 10, 2019, Murrey was charged with two counts of Attempted Possession with Intent to Distribute Cocaine and two counts of Assaulting, Resisting, or Impeding Certain Officers or Employees. After being detained by the magistrate, this Court revoked the detention order, giving Murrey a $10,000 unsecured bond. There was an issue with Murrey's tether battery and this Court temporarily revoked bond. Bond was reinstated a few months later. Murrey was otherwise fully compliant while on bond for three years.

The government alleged that Murrey would take deliveries of cocaine from suppliers in Chicago, Illinois with the intent to then sell the same. Murrey became the subject of a government sting operation whereby agents converged on a manufactured drug transaction involving Murrey. Murrey fled the scene, allegedly endangering officers, and was arrested months later. There was dispute in front of this Court as to the intentions of Murrey in fleeing and the evidence was non-existent as to intentions to hurt anyone.

Murrey took full responsibility for his actions, pleading guilty to four criminal counts. His guidelines were a staggering 292 to 365 months in prison, mainly because of a Criminal History Category VI designation. Murrey pled guilty without the benefit of a Rule 11 plea agreement. Probation reported to this Court before sentencing that Murrey is a family man with an "outpouring of support from family and friends" and a man who "expressed remorse for his actions." *See* PSI.

This Court sentenced Murrey to 260 months in prison. He has a projected outdate of April 26, 2031, which, according to probation, is actually somewhere between July and October of 2030 after factoring in the 6 to 9 month default early release and good time. Accordingly, using an outdate of July 2030, Murrey has served about 45% of his custodial sentence.

Murrey now makes this request for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) for the following reasons: first, Murrey satisfied the

exhaustion requirement contained in § 3582 by electronic cop out and hand delivery to the warden. His request for compassionate release was denied. Second, Murrey's multiple health conditions, recognized by the CDC as increasing an individual's risk of developing a severe case of COVID-19, constitute compelling and extraordinary reasons for his release. Third, a sentence reduction would not conflict with the factors outlined in § 3553(a).

In the alternative, Murrey asks that this court allow him to serve all or some of the remaining 55% of his sentence in home confinement or under similar supervised release conditions.

## II.    ARGUMENT

### A.    THE PRISON SETTING COMBINED WITH MURREY'S UNDERLYING HEALTH CONDITIONS CONSTITUTES A COMPELLING AND EXTRAORDINARY CIRCUMSTANCE WARRANTING RELEASE.

18 U.S.C. § 3582 permits a defendant to directly move a federal district court for compassionate release instead of solely relying on the Director of the Bureau of Prisons ("BOP") to make such a request. However, § 3582 also requires that a defendant "fully exhaust [] all administrative rights" or otherwise "wait for 30 days after the warden's receipt of [their] request" before petitioning the court for relief. *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020).

Murrey has exhausted administrative requirements. On May 31, 2020, Murrey requested compassionate release based on his medical ailments and COVID-19 and

having not heard anything, requesting compassionate release again on July 31, 2020. His requests were denied on August 14, 2020 by the prison warden. **Exhibit A**, Compassionate Release Denial. Accordingly, Murrey has satisfied the exhaustion requirement contained in § 3582, as 30 days have now passed since he submitted his request for compassionate release. *See Alam*, 960 F.3d at 834 ("Prisoners who seek compassionate release have the option to take their claim to federal court within 30 days, no matter the appeals available to them.").

Having exhausted, Section 3582 next instructs a court considering compassionate release to determine whether "extraordinary and compelling reasons warrant [a sentence] reduction" and whether "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *United States v. Jones,* _ F.3d _ (6th Cir. Nov. 20, 2020). However, this Court is no longer required to determine or find whether compassionate release would be justified under the U.S. Sentencing Guideline § 1B1.13, because it is not an "applicable policy statement in cases where incarcerated persons file their own motions in district court for compassionate release." *Id.* at 3.

In short, this Court is free to determine based on its own judgment and existing law whether the reasons presented in this motion are extraordinary and compelling. If it does, the Court then must consider whether a sentence reduction is consistent with the original sentencing factors under §3553(a). In this case, Murrey's health

conditions combined with a prison setting are extraordinary and compelling reasons for a sentence reduction and the sentencing factors do not counsel against release.

1. **Communal Prison Confinement Inherently Increases Inmates' Vulnerability to COVID-19.**

Murrey is currently incarcerated at USP Yazoo City, which is experiencing a deadly and tragic outbreak of COVID-19. **There are currently 150 active infections among inmates and staff on the Yazoo City prison campus.**[1] **4 inmates have lost their lives.** It is not surprising that the outbreak occurred in a state like Mississippi, which continues to host college football games with over 10,000 in attendance[2], despite the country enduring over 100,000 new COVID-19 cases per day and 2,000+ COVID-19 deaths per day. In fact, Mississippi set a record on November 30, 2020 for the largest seven-day average of new COVID-19 cases, while hospitals fluctuate between having "no available ICU beds" and only a few ICU beds available for patients.[3] Yazoo County, where USP Yazoo City is located,

---

[1] https://www.bop.gov/coronavirus/

[2] *Ole Miss Announces Football Attendance Plan*, https://olemisssports.com/news/2020/8/24/ole-miss-announces-football-attendance-plan.aspx

[3] *Mississippi sets new record for seven-day average of new COVID-19 cases*, https://www.sunherald.com/news/coronavirus/article247503375.html

is again shutting down schools and taking other drastic measures because of the large amount of spread in the area.[4]

As troubling as those numbers are alone, much remains unknown about the extent of the outbreak on the Yazoo City prison campus (even though its already catastrophic) because only half of the population has been tested. And even that number is doubtful because the BOP's disclaimer provides that the number of inmates who have been tested may be lower than reported, stating "one person may be tested more than once. The number of tests recorded per site reflects the number of persons at the specific facility who have been tested, **whether at that site or at a prior facility**." Fn. 2, *supra* (emphasis added).

Furthermore, new medical research also casts doubt on whether negative prison tests are truly negative. A study examining COVID-19 within a state prison found that of roughly 100 inmates that were exposed to COVID-19, 72% of them later tested positive for the virus – **with roughly a quarter of those inmates having "at least one early test that was negative**."[5] (Emphasis added).

---

[4]    *Mississippi's   Third   Coronavirus   Spike   is   Here*, https://www.jacksonfreepress.com/news/2020/nov/12/mississippis-third-coronavirus-spike-here/

[5] *COVID-19: Multisystem Inflammatory Syndrome in Children/Classroom Setting/Serial Testing in Prison*, https://www.jwatch.org/fw116781/2020/06/29/covid-19-multisystem-inflammatory-syndromechildren?query=pfw&jwd=0001017 68698&jspc=IM

The unreliable testing data seems to be in line with the BOP's *modus operandi* of minimizing the appearance of the virus' presence in its facilities. Consider, for example, the troubling statement from the BOP's own representative that "[t]he goal of [its] reporting is to provide the public with **insight** as to the current status of our COVID-19 response at various facilities . . . and does not necessarily account for the unconfirmed (non-tested) cases."[6] Another troubling, but candid, statement came from a BOP staff member working within FCI Oakdale, the first BOP facility to report a COVID-19 inmate fatality, explaining that the BOP was not testing inmates "because **they assume** if someone has symptoms, they have it."[7] (Emphasis added).

Therefore, the problem is not just the high number of active cases currently on the Yazoo campus, but also any unconfirmed, un-tested cases, as well as staff and others entering and exiting the facilities daily. All of these things will eventually lead to the deaths of more inmates and potentially staff. It is inevitable. People will die. On April 13, 2020, FCI Terminal Island reported nine cases of COVID-19 among inmates and staff. Three weeks later, on May 4, 2020, 623 inmates had tested

---

[6] *Bureau of Prisons Underreporting COVID-19 Outbreak in Prison,* https://www.forbes.com/sites/walterpavlo/2020/04/01/bureau-of-prisons-underreporting-outbreaks-in-prison/#d517db87ba32

[7] '*Something is Going to Explode': When Coronavirus Strikes a Prison*, https://www.nytimes.com/2020/04/18/magazine/oakdale-federal-prison-coronavirus.html

positive for the virus and five died. FMC Fort Worth and FCI Lompoc similarly reported shockingly high infection rates only weeks after initially confirming the virus' presence.[8]

The CDC's current best estimate is that 40% of individuals who contract COVID-19 are asymptomatic (possibly up to 70%) and, further, that 50% of those who do spread the virus do so prior to symptom onset.[9] Consequently, the CDC predicts that for every confirmed COVID-19 case, there at least 10 undiagnosed cases.[10] *See In re Manrique,* No. 19-mj-71055-MAG-1 (TSH), 2020 U.S. Dist. LEXIS 50017, at \*1 (N.D. Cal. Mar. 19, 2020) (noting that "the [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . We don't know who's infected."). No matter the procedures in the BOP, the inherent environment and limitations will allow the virus to spread and kill.

---

[8] *More Than 600 Inmates Test Positive for COVID-19 at Federal Prison in Fort Worth,* https://www.nbcdfw.com/news/coronavirus/more-than-600-inmates-test-positive-for-covid-19-at-federal-prison-in-fort-worth/2367644/; *Lompoc Prison COVID-19 Cases Skyrocket to 599,* https://www.independent.com/2020/05/07/lompoc-prison-covid-19-cases-skyrocket-to-599/

[9] *COVID-19 Pandemic Planning Scenarios,* Updated July 10, 2020, https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html

[10] *CDC Head Estimates U.S. Coronavirus Cases Might be 10 Times Higher than Data Show,* https://time.com/5859790/cdc-coronavirus-estimates/

It being clear that there is a currently uncontrolled outbreak at the facility, the Court should next consider why that is so. Correctional settings inherently prevent inmates from protecting themselves from infectious diseases like COVID-19 because of prison living conditions. Although BOP facilities have been on lockdown for months to try to combat the unique challenges prisons are facing, inmates still remain in close proximity to each other, are unable to practice social distancing, and share the same ventilation system, phones, showers, computers, and other things without adequate sanitation. Over **24,000 inmates** have tested positive for COVID-19 and **145 inmates have died** despite the months' long lockdown. This rate is about **6 times** deadlier than the ordinary seasonal influenza virus. Accordingly, both the CDC and courts within this district have emphasized the heightened dangers inmates face due to their living situation.[11]

Murrey reports that in being transferred from his previous facility to Yazoo City, there about 80 inmates transferred with him. Upon arrival, the inmates were

---

[11] *See United States v. Atwi*, No. 18-20607, 2020 U.S. Dist. LEXIS 68282, at *11 (E.D. Mich. Apr. 20, 2020) ("There can be little doubt that incarcerated individuals face an even greater risk of transmission, given the conditions frequently present in correctional and detention facilities"); *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CDC (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html ("Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced").

put into different units and mixed in with the new population. 12 former FMC Lexington inmates (Murrey's prior facility) are now positive for COVID-19 after coming into contact with the virus at the new facility. The government has been self-congratulating itself for the BOP's measures over the last few months, but such it is not in order. The BOP's cavalier handling of the virus remains appalling – both for its staff and its custodial population.

In addition to dangerous living conditions within the prison, BOP staff (as well as delivery people and others entering the prison every day) are likely continually introducing the virus to prisons. This is self-evident here, where there are positive cases among staff. Gyms, bars, and movie theaters are available to Mississippians.[12] Instead of providing mass testing for its staff, the BOP often instructs them to turn to state health departments.[13] *See United States v. Cotton,* No. 16-20222-8, 2020 U.S. Dist. LEXIS 112198, at *9 (E.D. Mich. June 26, 2020) (expressing concern "that inmates and staff members are interacting with one another as normal and blissfully unaware of the virus spreading throughout the

---

[12]https://www.propublica.org/article/states-with-few-coronavirus-restrictions-are-spreading-the-virus-beyond-their-borders

[13] *BOP Pushes Staff COVID Testing Responsibility Onto Outside Programs*, https://www.federaltimes.com/management/2020/06/05/bop-pushes-staff-covid-testing-responsibility-onto-outside-programs/

prison" where the prison was located in a county reporting over 100 confirmed cases).

In short, despite BOP efforts to contain COVID-19, the bottom line is that "prisons are tinder boxes for infectious disease." *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 U.S. Dist. LEXIS 58718, at *2 (E.D. Pa. Apr. 1, 2020). *See also United States v. Muniz*, No. 4:09-CR-0199-1, 2020 U.S. Dist. LEXIS 59255, at *3 (S.D. Tex. Mar. 30, 2020) ("while the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers . . . demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection").

### 2.   Murrey Has Conditions Which the CDC Explicitly Recognizes as Risk Factors for Severe Illness.

Murrey is at much higher risk than the general population at USP Yazoo City for catastrophic health consequences should he contract COVID-19. Murrey is an obese, diabetic, 49-year old man who is taking immunosuppressive medications. **Exhibit B,** Medical Records.[14] He is categorized as a chronic care inmate. *Id.* Murrey's obesity and diabetes, along with his age and medications, heighten his vulnerability to developing a severe case of COVID-19.

---

[14] Murrey found sealing these particular records unnecessary, but asks the Government to do so to avoid anything private and unknown in other records.

First, Murrey is medically obese. Obesity not only increases his chances of severe illness, but also increases his chances of *contracting* COVID-19. Murrey reports his BMI, corroborated by his PSI, as about 33 kg/m$^2$. *See,* Pre-Sentence Report and **Ex. B**. Upon information and belief, Murrey has gained weight during the lockdown due to his inability to move regularly and limited food options. Since the beginning of the pandemic, the CDC has recognized a BMI of 40 or more as substantially increasing risk for severe disease and poor outcomes. However, obesity is so dangerous in this context, that the CDC issued updated guidance in June of this year lowering the threshold number to a BMI of 30 or higher.[15] Thus, with a BMI of about 33 kg/m$^2$, Murrey is considered medically obese and is at substantially increased risk for severe COVID-19 according to the CDC and medical data.[16][17] **Exhibit C,** Inmate Detail Sheet (Murrey's BMI here indicates about a 32 BMI, which does not change the analysis. The weight relied upon here is from over a year ago and Murrey reports he is at least 190 since the lockdown began, but has gained since).

---

[15] *CDC Updates, Expands List of People at Risk of Severe COVID-19 Illness*, (Jun. 25, 2020), https://www.cdc.gov/media/releases/2020/p0625-update-expands-covid-19.html

[16] https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm

[17] https://www.urmc.rochester.edu/highland/bariatric-surgery-center/journey/morbid-obesity.aspx

This Court should be clear: obesity is likely the single biggest predictive factor for severe COVID-19 disease. On August 26, 2020, a peer-reviewed study of 399,000 patients found that people "with obesity who contracted SARS-CoV-2 were 113% more likely than people of healthy weight to land in the hospital, 74% more likely to be admitted to an ICU, and 48% more likely to die."[18] Indeed, a "constellation of physiological" factors underlie these numbers. *Id.* Biological factors that lead to increased risk when obese include impaired immunity, chronic inflammation, and blood clotting tendencies.

Neveed Sattar, an expert in cardiometabolic disease at the University of Glasgow, stated that obesity "seems to be a linear line, straight up" in terms of severe disease. *Id.* And critically, one need not be morbidly obese but merely obese by medical standards, which Murrey is. A study of 334,000 patients in England demonstrated that the risk peaked at a BMI of 35, increasing the risk of many people who may not realize they have tipped into overweight territory.[19]

---

[18] Why COVID-19 is more deadly in people with obesity – even if they're young, Pulitzer Center and Heising-Simons Foundation, http://www.sciencemag.org/news/2020/09/why-covid-19-more-deadly-people-obesity-even-if-theyre-young

[19] Overweight, obesity, and risk of hospitalization for COVID-19: A community-based cohort study of adults in the United Kingdom, Mark Hamer et al, Proc Natl Acad Sci USA 2020, found at pubmed.ncbi.nlm..nih.gov.

And it is important to understand why obesity plays such a role. For one, it is mechanics: fat pushes the diaphragm into the lungs and restricts airflow; restricted airflow collapses airways in the lower lung so a person is less oxygenated; fat cells "infiltrate organs where immune cells are produced and stored" so the body is less effective at fighting disease and because immune cells "don't function [] well in an obese state"; and this inability to have an effective immune system is borne out in research showing that obese people respond worse to vaccines. *See* fn. 19. These latter reasons also explain why you are more *susceptible* in the first place, because you have a worse immune response than a person at a healthy weight.

In sum, to put in perspective how dangerous being overweight is when it comes to this disease, consider that about 250,000 people have died in the United States. If all else was equal, based on the findings of the massive study above, we would expect that about 162,500 of those people had BMIs over 30, compared to 87,500 with BMIs under 30. The difference is enough to fill Ford Field and Little Caesars arena at the same time.

Second, Murrey faces a heightened risk of death should he contract COVID-19 because he is a Type 2 diabetic. **Ex. B.** Murrey's blood sugar was highly elevated last year, reaching a HbA1C of 6.8%.[20] *Id.* He has been diagnosed as a diabetic. A

---

[20] According to the Mayo Clinic, an A1C test measures an individual's blood sugar levels for the previous two to three months. An A1C level between 5.7 and 6.4

recently published medical study demonstrates just how serious Type 2 diabetes can be when facing a COVID-19 infection. After analyzing the fatality data for the entire population of England, researchers concluded that **roughly a third of the country's deaths occurred in people with Type 2 diabetes**.[21] Another study similarly reported that "diabetes was associated with a more than double risk for ICU admission and a more than tripled risk for death."[22]

The CDC recognizes Type 2 diabetes as a risk factor for severe COVID-19 illness and even notes that it is one of the risk factors supported by the "strongest and most consistent evidence" based on numerous medical studies.[23] Many district courts have accordingly deemed Type 2 diabetes as a condition which constitutes compelling and extraordinary circumstances warranting early release.[24]

---

constitutes prediabetes, with an A1C of 6.5 or higher qualifying as diabetes. *See A1C Test*, https://www.mayoclinic.org/tests-procedures/a1c-test/about/pac-20384643

[21] Barron et al., *Associations of type 1 and type 2 diabetes with COVID-19-related mortality in England: a whole-population study* (Aug. 13, 2020), https://www.thelancet.com/journals/landia/article/PIIS2213-8587(20)30272-2/fulltext

[22] Cariou et al., *Phenotypic characteristics and prognosis of inpatients with COVID-19 and diabetes: the CORONADO study* (May 29, 2020), https://link.springer.com/article/10.1007/s00125-020-05180-x#ref-CR14.

[23] Centers for Disease Control, *Evidence Used to Update the List of Underlying Medical Conditions That Increase a Person's Risk of Severe Illness from COVID-19*, (Jul. 28, 2020), https://bit.ly/2PLhO2b.

Third, in combination with the above, Murrey is vulnerable to serious complications from COVID-19 due to his age of 49 (he will be 50 in February 2021). The CDC recognizes that each one year increase in age makes an individual more susceptible to serious complications.[25] Specifically, the CDC's most recent guidance no longer limits increased risk to solely those above 65 years old and instead warns that "among adults, risk increases steadily as you age." Further, the CDC states that recent data shows "the older people are, the higher their risk of severe illness from COVID-19." *Id.*

An illuminating study conducted by the CDC demonstrates why the threshold of 65 was removed. When compared to individuals between 18 and 29 years old,

---

[24] *United States v. Lewis*, No. 16-cr-302, 2020 WL 2081374, at *1 (S.D.N.Y. Apr. 30, 2020) (finding compassionate release appropriate where "it [wa]s beyond dispute that [the inmate was] at high risk from COVID-19, as the literature makes clear that diabetes is one of the most significant comorbidity factors"); *United States v. Colvin*, No. 3:19-cr-179, 2020 U.S. Dist. LEXIS 57962, *8-9 (D. Conn. Apr. 2, 2020) (finding extraordinary and compelling reasons where the defendant suffered from "diabetes, a serious medical condition which substantially increases her risk of severe illness if she contracts COVID-19."); *United States v. Jackson*, No. 18-CR-5477-GPC, 2020 U.S. Dist. LEXIS 114706, at *8 (S.D. Cal. June 22, 2020) (noting that "[e]arly research indicates that diabetes patients, have mortality rates more than twice the overall rate; the World Health Organization has found that fatalities in the overall population occur in about 3.8 percent of cases, while the fatality rate of those with diabetes is 9.2 percent").

[25] Centers for Disease Control and Prevention, *CDC Updates, Expands List of People at Risk of Severe COVID-19 Illness*, https://www.cdc.gov/media/releases/2020/p0625-update-expands-covid-19.html.

those between 40 and 64 years old were four times more likely to be hospitalized after contracting COVID-19 and thirty times more likely to die from the virus.[26] Thus, Murrey faces increased risk due to his age alone. *See United States v. Haynes*, No. 14-20083, 2020 U.S. Dist. LEXIS 145107, at *7-8 (E.D. Mich. Aug. 13, 2020) (granting compassionate release and noting the increased risk the defendant faced as a man in his forties) (citing COVID-19 Hospitalization and Death by Age *supra* note 12); *United States v. Glover*, No. 07-cr-00152, 2020 U.S. Dist. LEXIS 152064, *9 (D. D. C. Aug. 21, 2020) ("the CDC reports that the hospitalizations per 100,000 people increase by approximately 60% between individuals ages 40-49 and those aged 50-64.") (citing same).

Fourth, Murrey's risk is heightened because he takes steroids for his severe skin condition. **Ex. B.** The CDC has recognized that "[h]aving a weakened immune system may increase your risk for severe illness" and that "many conditions and treatments can cause a person to be immunocompromised or have a weakened immune system. These include . . . prolonged use of corticosteroids."[27] The medication taken by Murrey is a corticosteroid.

---

[26] Centers for Disease Control and Prevention, *COVID-19 Hospitalization and Death by Age*, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.htm

[27] Centers for Disease Control, *People with Certain Medical Conditions* (Oct. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#immunocompromised-state.

Pursuant to the CDC guidelines, numerous district courts have recognized the risk associated with corticosteroid usage for federal inmates in the BOP. *United States v. Collins*, No. 10-cr-00963-1, 2020 U.S. Dist. LEXIS 121398, at *11 (N.D. Ill. July 10, 2020) (citing the Mayo Clinic "[c]orticosteroids . . . suppress your immune system, which can help control conditions in which your immune system mistakenly attacks its own tissues."); *United States v. Grimm*, No. 2:08-CR-64 JCM (GWF), 2020 U.S. Dist. LEXIS 94683, at *8 (D. Nev. May 29, 2020) ("The CDC includes the '[u]se of oral or intravenous corticosteroids or other medicines called immunosuppressants that lower the body's ability to fight some infections' as a condition or treatment that 'can weaken a person's immune system' (making them immunocompromised)").

Likewise, numerous courts have considered a defendant's steroid use in determining whether extraordinary or compelling reasons exist. *United States v. Meron*, No. 2:18-cr-0209-KJM, 2020 U.S. Dist. LEXIS 161711, at *5 (E.D. Cal. Sep. 2, 2020) ("in light of the CDC's guidelines, particularly with respect to the effect of immunosuppressant medications, the court concludes Meron is at a high risk of developing severe symptoms if he contracts COVID-19"); *United States v. Gallman*, No. 14-cr-292-PWG-1, 2020 U.S. Dist. LEXIS 108762, at *8 (D. Md. June 22, 2020) ("Both parties agree that Defendant meets the 'extraordinary and compelling reasons' threshold because of his kidney transplant in 1996 and prolonged use

18

of corticosteroids."); *United States v. Goins*, No. 11-cr-20376, 2020 U.S. Dist. LEXIS 100358, at *8 (E.D. Mich. June 9, 2020) (granting compassionate release to a defendant who had occasionally taken "a corticosteroid that suppresses [his] immune system"); *United States v. Gonzalez*, No. 13-CR-101-JPS, 2020 U.S. Dist. LEXIS 137372, at *6 (E.D. Wis. Aug. 3, 2020) (granting compassionate release to defendant whose prescriptions included a corticosteroid because "[i]mmunosuppressant medications can increase the risk of infection, and corticosteroids are associated with severe COVID-19 illness").

Murrey urges this Court to find that his vulnerability to severe illness, due to his obesity, Type 2 diabetes, and age, constitute extraordinary and compelling reasons for release – especially when viewed in light of the dangerous conditions at USP Yazoo City.

## B.   A SENTENCE REDUCTION IS ALSO CONSISTENT WITH THE SENTENCING COMMISSION'S POLICY STATEMENTS AND THE FACTORS OUTLINED IN § 3553(a)

When extraordinary and compelling reasons are established, the Court must then consider whether a sentence reduction would "be consistent with the applicable policy statements issued by the Sentencing Commission" and supported by the "factors set forth in section 3553(a)." § 3582(c)(1)(A).

## I.      The Court Skips Consideration of U.S.S.G. § 1B1.13(2)

Prior to the Sixth Circuit's holding in *United States v. Jones*, *supra,* district courts were routinely reviewing whether "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)" before granting an inmate compassionate release. U.S.S.G. § 1B1.13(2). Jones, however, makes clear that district courts are no longer to consult §1B1.13, holding that in "cases where incarcerated persons file motions for compassionate release, federal judges may skip step two of the 3582(c)(1)(A) inquiry and have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13." *Id.* at 16.

Instead, the district court moves on to consider only the sentencing factors. *Id.*

## II.      § 3553(a) Factors

The sentencing factors weigh in favor of Murrey's sentence reduction. In deciding what is "sufficient but not greater than necessary, to comply with the purposes of [sentencing]," § 3553(a) instructs a court to consider the following:

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

**(2)** the need for the sentence imposed—

**(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

**(B)** to afford adequate deterrence to criminal conduct;

20

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) [the kinds of sentence and sentencing range provided for in the USSG]

(5) any pertinent [Sentencing Commission policy statement]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense

*United States v. Sawicz*, No. 08-cr-287 (ARR), 2020 U.S. Dist. LEXIS 64418 at *7, 8 (E.D.N.Y. Apr. 10, 2020) (summarizing § 3553(a)).

First, the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic. Murrey acknowledges the serious nature of the crimes he committed, which qualified him for a considerable sentence. But at the same time, Murrey's actions did not warrant a sentence that includes exposure to life-threatening illness or death. *Tyler v. United States*, No. 4:12-cr-37, 2020 U.S. Dist. LEXIS 171702, at *9 (E.D. Va. Sep. 18, 2020) ("Although Petitioner's original sentence was lawfully imposed in accordance with the § 3553(a) factors, serious illness and the potential for an accelerated death was decidedly *not* among the

reasons for it"); *Rodriguez*, 2020 U.S. Dist. LEXIS 58718 at *32 (noting that when a defendant's sentence was imposed it "did not include incurring a great and unforeseen risk of severe illness or death.").

For this reason, a sentence reduction in this one-in-a-lifetime pandemic would not undermine the serious nature of the offense, nor the need for just punishment and deterrence. No rational actor would look at compassionate release because of this public health crisis and think that their crimes are less serious or that they will not be punished. That would be an irrational conclusion. *United States v. Turner*, No. 18-CR-142, 2020 U.S. Dist. LEXIS 175572 (E.D. Wis. Sep. 24, 2020) ("to the extent would-be drug traffickers pay attention to such matters, it is highly doubtful that the potential death of a child's care-giver and how 18 U.S.C. § 3582(c)(1)(A) might apply in that situation factors into the decision whether to break the law"); *United States v. Alam*, No. 15-20351, 2020 U.S. Dist. LEXIS 130118, at *18 (E.D. Mich. July 23, 2020) ("Alam's release will not produce unwarranted sentencing disparities because it accounts for his unique medical conditions in light of the COVID-19 pandemic).

Murrey has also demonstrated that he can be successful and respect the Court's conditions. As a threshold matter, Murrey's PATTERN score demonstrates a low risk of recidivism. **Exhibit D,** Risk Worksheet. More specifically, despite the government's insistence that Murrey be incarcerated prior to trial, this Court granted

Murrey pretrial release. He went three years without incident – only a GPS tether battery malfunction. *See United States v. Wren*, No. 10-cr-20137, 2020 U.S. Dist. LEXIS 156155, at *10 (E.D. Mich. Aug. 28, 2020) ("When the Court decided to release Wren on bond pending trial in 2010, it determined that conditions could be imposed such that Wren would not pose a danger to the community."); *United States v. Gardner*, No. 14-CR-20735-001, 2020 U.S. Dist. LEXIS 129160, at *20 (E.D. Mich. July 22, 2020) ("There is no reason for the Court to assume that Mr. Gardner presents a greater danger now, six years after the offense and following service of a prison sentence, than he did when he was released on bond."); *United States v. Locke*, No. CR18-0132 RAJ, 2020 U.S. Dist. LEXIS 102592, at *14 (W.D. Wash. June 11, 2020) ("The concern for Mr. Locke being a danger to the community was significantly mitigated based upon his performance on pretrial supervision.")

Furthermore, the punitive nature of Murrey's sentence has increased significantly due to COVID-19, the resulting months long lockdowns, and his transfer to a higher security facility. Murrey was transferred to USP Yazoo City, a high security facility, from a lower security facility in FMC Lexington (Lexington is a minimum security satellite camp with better medical facilities). He was told that the reason for the transfer was to "get the population down" to better maintain social distancing. His situation at Yazoo as compared to FMC Lexington is a much more severe and restrictive lockdown. *United States v. Lopez*, 2020 U.S. Dist. LEXIS

106989, at *10 (S.D.N.Y. June 15, 2020) ("Since the inception of the pandemic, the punitive aspects of prison life have skyrocketed and the rehabilitative opportunities have been severely diminished.").[28] On Thanksgiving, Murrey and all other inmates were locked down all day due to a staff shortage. Murrey is being treated as though he is in a super-max facility. While it is not lost on Murrey, nor the undersigned, that part of the purpose of federal prison is punishment, the last eight months in lockdown have been more punitive than it would have been but for the pandemic.

Finally, Murrey has demonstrated substantial rehabilitation and a commitment to being a better member of society. While incarcerated, Murrey only had one disciplinary incident – a minor violation for making a three way call nearly 7 years ago. He otherwise has been a model inmate, suitable for lower security incarceration. He has also taken over 40 BOP classes on topics ranging from money management and parenting to changing criminal thinking and meditation. **Exhibit E,** Classes. He worked in the paint shop for two years and currently works in the steam shop.

---

[28] *See also*, *United States v. Hooker*, 2020 U.S. Dist. LEXIS 141626, at *19-20 (S.D.N.Y. Aug. 3, 2020) ("Inmates are subject to far greater restrictions on their ability to move around and engage in positive programming, while . . . terrified of contracting the virus, and terrified of each other . . . Mr. Hooker's incarcerate experience has been highly punitive"); *United States v. Cummings*, No. 12-CR-445-14 (JMF), 2020 U.S. Dist. LEXIS 103931, at *3 (S.D.N.Y. June 10, 2020) ("For one thing, the conditions of Cummings's confinement — which have included varying degrees of lock downs, — have been far harsher than the Court had reason to believe they would be when imposing [its sentence]").

Murrey has many protective factors should he be released. He plans to live with his wife, Shanier Murrey, who writes: "I don't want him to die. He can't die. Ray has the purest heart ever. He's the most loving and caring man I've ever known. Ray is a very supportive and helpful husband." **Exhibit F,** Letters. He intends to live at an address that can provided in Bloomfield Hills where his son and wife reside. His son writes: "I wake up everyday wishing I could walk in the kitchen and say 'Good morning pops' again...I have already lost my grandfather a couple of months ago to this horrible disease. Please allow my dad an early release because it will give him another chance to reunite with our family and become a productive citizen." *Id.* His sister-in-law writes: "Rafael Murrey Sr. is of no threat to anyone, nor to his community. He is a loving and caring person who deserves to be home with his family."[29] *Id.* Murrey also has employment available to him if the Court permits. *Id.* at letter from Gia McIntyre.

There are no frontline workers in the home and Murrey intends to follow any instructions of the Court, as he proved on supervised release facing such a high sentence. He is a devoted husband and father of three, involved in all of his children's lives. Murrey writes to the undersigned that he has "learned from my mistakes" and

---

[29] This is a sample of letters of support for Murrey. But as noted in Murrey's PSI: "MURREY has an outpouring of support from family and friends, who have submitted character letters on the defendant's behalf. He has expressed remorse for his actions which led to his conviction in the instant offense."

25

that he was "poisoning [his] community [and] didn't even know it."

### III.   <u>CONCLUSION</u>

For the foregoing reasons, Defendant requests that this Honorable Court enter an order reducing his sentence to time served and a period of supervised release with any conditions the Court sees fit, including home confinement.

Respectfully Submitted,

Date: December 3, 2020                WADE FINK LAW P.C.

/s/ Wade G. Fink
Wade G. Fink (P78751)
370 E. Maple Rd., Third Floor
Birmingham, MI 48009
wade@wadefinklaw.com

---

### <u>PROOF OF SERVICE</u>

I hereby certify that on December 3, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

/s/ Wade G. Fink
Wade G. Fink (P78751)
370 E. Maple Rd., Third Floor
Birmingham, MI 48009
248-712-1054
wade@wadefinklaw.com

---