UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

      Plaintiff,                                      Case No. 09-20473

v.                                             Hon. Victoria A. Roberts

Rafael Murrey,

      Defendant.

_____/

## United States' Response Opposing the Defendant's
## Emergency Motion for Compassionate Release

Rafael Murrey joined a drug trafficking organization in 2008 and distributed large quantities of cocaine across the Detroit area before he got caught. In May 2011, Murrey pleaded guilty, without a plea agreement, to counts of attempted possession and conspiracy with intent to distribute five kilograms or more of cocaine and two counts of assaulting, resisting, or impeding law enforcement officers. On June 29, 2012, this Court sentenced him to 260 months imprisonment, slightly below the applicable sentencing guideline range. This is Murrey's *third* felony drug conviction.

Murrey began serving his current sentence on January 11, 2013. (Ex. 1, p. 2.) He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A),

1

asserting that his underlying medical conditions heighten his risk of developing serious complications should he contract Covid-19, and citing a large outbreak of Covid-19 cases at his current facility, USP Yazoo City. Murrey's motion should be denied.

Murrey does not satisfy the substantive requirements for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Murrey's increased risk of severe complications from Covid-19 based on his obesity and Type II diabetes qualifies as an "extraordinary" reason for release. But his conviction and criminal record establish that he is dangerous, and he has not demonstrated that his release would reduce his risk of contracting Covid-19, which prevents him from showing a "compelling" justification for release. And the § 3553(a) factors do not support release, particularly in light of the seriousness of the offense and because Murrey has only served less than half of his custodial sentence.

The Bureau of Prisons has also taken significant steps to protect all inmates, including Murrey, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict

2

protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of November 23, 2020, this process has already resulted in the BOP releasing at least 137 inmates who were sentenced in the Eastern District of Michigan. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 961 F.3d at 845—the Court should deny Murrey's motion release.

## Background

In 2008, the Drug Enforcement Administration (DEA) launched an investigation into a drug trafficking ring, which uncovered a conspiracy to transport multi-kilogram quantities of cocaine and heroin from Chicago, Illinois, to Detroit, Michigan, for further distribution and sale. (Presentence Investigation Report (PSR) ¶16.) Murrey participated in the conspiracy by accepting deliveries of the drugs and distributing them in the Detroit area. (PSR ¶¶ 16, 18.) More than 500 kilograms of cocaine were sold during the course of the conspiracy, for approximately $15 million in proceeds. (PSR ¶ 17.)

As part of its investigation, the DEA attempted a reverse sting operation on December 2, 2018, using a confidential informant (CI). (PSR ¶ 19). The CI contacted Murrey to inform him of an incoming shipment of 40 kilograms of cocaine and arranged to deliver the cocaine to Murrey at a location in Detroit. DEA agents attempted to arrest Murrey at the scene of the delivery, but Murrey disregarded their commands, ran to his vehicle, and sped away, while one of the agents was holding onto the door of Murrey's vehicle. Agents tried to block Murrey's escape with their vehicles, but Murrey drove directly toward and hit one of those vehicles and then fled the scene, leading the agents on a high-speed chase through the streets of Detroit. Murrey escaped capture that day and for nine months thereafter; he was eventually arrested on September 11, 2009.

On December 16, 2009, Murrey was charged in a superseding indictment with counts of Attempted Possession and Conspiracy to Possess With Intent to Distribute Five Kilograms or More of Cocaine, in violation of 21 U.S.C. §§ 846, 841(a), and 841(b)(1)(A), and two counts of Assaulting, Resisting, or Impeding Certain Officers or Employees, in violation of 18 U.S.C. § 111. In light of Murrey's two prior felony drug convictions, the Government subsequently filed a Sentencing Enhancement Information pursuant to 21 U.S.C. § 851, which subjected Murrey to a mandatory minimum sentence of 20 years imprisonment.

4

Murrey pleaded guilty to all four counts in the superseding indictment on May 5, 2011. And on June 29, 2012, this Court imposed a below-Guidelines sentence of 260 months in prison. The Sixth Circuit affirmed this sentence on direct appeal. *United States v. Murrey,* 531 F. App'x 653 (6thCir. 2013).

Murrey began serving his prison sentence on January 11, 2013, and is currently incarcerated at USP Yazoo City. His projected release date is April 26, 2031, and he is eligible for home detention on October 26, 2030. (Ex. 1, p. 2.) Murrey is 49 years old and has underlying medical conditions of obesity, diabetes, and a chronic skin condition that is treated with corticosteroids. Nevertheless, Murrey has moved for compassionate release, citing his medical conditions and the Covid-19 pandemic. Alternatively, Murrey asks that he be allowed to serve all or some of his remaining sentence in home confinement or under similar supervised release conditions. The relief Murrey seeks should be denied.

## Argument

I.  **The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

A.  **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For

5

over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

On March 13, 2020, the Bureau of Prisons started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. When visitation is permitted at an

institution, the visits are non-contact, require masks, and social distancing between inmates and visitors is enforced, either via the use of plexiglass (or similar barriers), or physical distancing (i.e., six feet apart). Visitors are screened for Covid-19 symptoms and their temperature is checked. Visitors who are sick or symptomatic are not allowed to visit, and inmates in quarantine or isolation cannot participate in social visiting. *See* BOP Modified Operations. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month, and legal visits are accommodated upon request. *See* BOP Modified Operations.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

### B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of

7

time for which [it] is authorized to place a prisoner in home confinement" during

the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act

(CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27,

2020). The Attorney General has also issued two directives, ordering the Bureau of

Prisons to use the "various statutory authorities to grant home confinement for

inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-

26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The

directives require the Bureau of Prisons to identify the inmates most at risk from

Covid-19 and "to consider the totality of circumstances for each individual inmate"

in deciding whether home confinement is appropriate. (03-26-2020 Directive to

BOP, at 1).

   The Bureau of Prisons' efforts on this point are not hypothetical. Currently,

the Bureau of Prisons has 8,045 inmates on home confinement, and the total

number of inmates placed in home confinement from March 26, 2020 to the

present (including inmates who have completed service of their sentence) is

18,728. BOP Coronavirus FAQs. As the Sixth Circuit stressed, these efforts show

that "[t]he system is working as it should": "A policy problem appeared, and

policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir.

2020).

8

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors,

including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, 452 F.Supp.3d 705, 712 (E.D. Mich. 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.     The Court should deny Murrey's motion for compassionate release.

Murrey's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific

statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). And as the Sixth Circuit has held, this statutory exhaustion requirement is mandatory. *Alam*, 960 F.3d at 832–36. Here, Murrey submitted requests for compassionate release and/or home confinement to the warden at FMC Lexington on May 31, 2020, June 25, 2020, and July 31, 2020.  The warden denied Murrey's requests on August 14, 2020 and October 27, 2020. (Ex. 2.) Murrey has exhausted his administrative remedies.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for release. 18 U.S.C. § 3582(c)(1)(A). The defendant's "generalized fears of contracting Covid-19, without more," do not satisfy this requirement. *United States v. Jackson*, 2020 U.S. App. LEXIS 32269, at *6 (6th

Cir. Oct. 13, 2020); *accord United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *2 (6th Cir. May 21, 2020).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020). As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A. Murrey has not shown "extraordinary and compelling reasons" for compassionate release.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), contains two overlapping requirements for scrutinizing an inmate's initial eligibility for release. First, an inmate must demonstrate that "extraordinary and compelling reasons" warrant a reduction in his sentence. *Id.* Second, release must be "consistent with applicable policy statements issued by the Sentencing Commission." *Id.* That applicable policy statement *should* be USSG § 1B1.13, which contains various criteria related to a defendant's medical conditions, age-related issues, family circumstances, or other reasons, USSG § 1B1.13 cmt. n.1, and which requires that

13

the defendant "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2). That policy statement should be binding here, as the analogous policy statement in USSG § 1B1.10 is for sentence reductions under 18 U.S.C. § 3582(c)(2). *See Dillon v. United States*, 560 U.S. 817, 819 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). Recently, however, a Sixth Circuit panel concluded in *United States v. Jones*, ___ F.3d ___, No. 20-3701, 2020 WL 6817488, *6 (6th Cir. Nov. 20, 2020), that § 1B1.13 is not "applicable"—and thus does not apply at all—to defendant-initiated motions for compassionate release.

*Jones*'s analysis on that point was incorrect, and the government preserves for further review its argument that USSG § 1B1.13 is binding here and that Murrey has failed to satisfy its requirements. Further, as Judge Cook's concurrence made clear, the *Jones* panel's discussion of § 1B1.13 was dicta. *Jones*, 2020 WL 6817488, at *13 (Cook, J., concurring). The only holding in *Jones* was that the district court there did not abuse its discretion in denying release based on the § 3553(a) factors. *Id.* So the remainder of the panel's opinion is not binding. *See Wright v. Spaulding*, 939 F.3d 695, 700–02 (6th Cir. 2019) (explaining that "only holdings" and "not dicta" are binding in subsequent cases).

14

But even if the Court were to follow the dicta in *Jones*, Murrey has not satisfied the statutory requirement of showing that "extraordinary and compelling reasons" warrant a sentence reduction. Even if not mandatory, § 1B1.13 continues to "provide a working definition of 'extraordinary and compelling reasons,'" which can "guide" a district court's decision "without being conclusive." *United States v. Gunn*, ___ F.3d ___, No. 20-1959, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020). And even without § 1B1.13, the plain language of the compassionate-release statute does not permit "a sort of Wild West" or allow "every district judge [to] hav[e] an idiosyncratic release policy." *Id.* The analyses of the Sentencing Commission, as represented in § 1B1.13 and its Application Notes, and the BOP Director should still be "given substantial weight," and "strik[ing] out on a different path risks an appellate holding that judicial discretion has been abused." *Id.*; *see also Jones*, 2020 WL 6817488, at *9 (quoting with approval a prior panel's observations that "'discretion' does not mean 'whim'" and "[a] court might abuse its discretion, for example, if it misreads the meaning of the extraordinary-reason requirement").

That statutory language, rather, requires that a defendant satisfy two strict criteria to be initially eligible for compassionate release. 18 U.S.C. § 3582(c)(1)(A)(i). *First*, the defendant's reasons must be "extraordinary"—

meaning exceptional or uncommon. *United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020); *United States v. Sapp*, No. 14-CR-20520, 2020 WL 515935, at *3 (E.D. Mich. Jan. 31, 2020). *Second*, the defendant's reasons must be "compelling"—meaning "so great that irreparable harm or injustice would result if the relief is not granted." *Sapp*, 2020 WL 515935, at *3. A defendant must establish both criteria to satisfy the statute's eligibility threshold. Murrey has not done so.

*First*, as an initial matter, the government agrees that Murrey's circumstances qualify as "extraordinary." Murrey's medical records establish that he is obese[1] and has Type II diabetes, which the CDC has confirmed are risk factors that place a person at increased risk of severe illness from Covid-19. Murrey's use of corticosteroids might place him an increased risk, according to the CDC. *See* CDC Risk Factors (as updated). Given the heightened risk that Covid-19 poses to someone with obesity and Type II diabetes, Murrey has shown "extraordinary" reasons for release under § 3582(c)(1)(A).

*Second*, however, Murrey's reasons for release are not "compelling." In the pretrial-release context, the Sixth Circuit has already addressed what qualifies as a

---

[1] Murrey is 5'4" and weighed 190 pounds as of December 1, 2020. (Ex. 4, p. 66). His Body Mass Index (BMI) is 32.6; anything above 30 is obese.

"compelling" reason for release based on Covid-19. *United States v. McGowan*, No. 20-1617, 2020 WL 3867515, at *2 (6th Cir. July 8, 2020); *Bothra*, 2020 WL 2611545, at *2. That analysis considers (1) the "original grounds" for the defendant's incarceration; (2) the "specificity" of his "stated Covid-19 concerns"; (3) the extent to which the proposed release plan would "mitigate or exacerbate" his risk from Covid-19; and (4) the risk from Covid-19 that his release would pose to others. *McGowan*, 2020 WL 3867515, at *2. In *Bothra*, for instance, the defendant was in his 70s and "had health issues rendering him more vulnerable to contracting [Covid-19]." 2020 WL 2611545, at *2. But he was a flight risk, had orchestrated a large and complex fraud scheme, and was detained at a facility that had very few cases of Covid-19. *Id.* The Sixth Circuit thus held that his circumstances did not present a "compelling" reason for release. *Id.*

Murrey's circumstances are even less compelling. The "original grounds" for Murrey's incarceration here were his participation in a drug trafficking ring that ultimately distributed over 500 kilograms of cocaine across the Detroit area. His conviction for that offense, especially when combined with his previous two felony drug convictions, showed that Murrey required a mandatory minimum sentence of 20 years in prison. It also showed that Murrey is dangerous, as contemplated under USSG § 1B1.13(2), which should continue to "guide" the Court's analysis here.

17

*Gunn*, 2020 WL 6813995, at *2. Indeed, the Sixth Circuit has made clear that even run of the mill drug dealers without any indication they are engaged in violence are dangerous because "drug trafficking is a serious offense that, in itself, poses a danger to the community." *United States v. Stone*, 608 F.3d 939, 947 n.6 (6th Cir. 2010). And unlike the pretrial defendant in *Bothra*, Murrey was *convicted* of his offense here—not just accused of it. So the justice system's "essential" interest in finality weighs far stronger against Murrey's release than it did the defendant's release in *Bothra. Teague v. Lane*, 489 U.S. 288, 309 (1989).

Additionally, Murrey's medical records reflect that his diabetes is well controlled through medication, diet, and exercise, and he has been consistently counseled about his diabetes within the BOP. Murrey was diagnosed with Type II diabetes in April 2019 when routine bloodwork revealed that his blood sugar (hemoglobin A1C) was at a level of 6.8%. (Ex. 3, pp. 34-36.) (CDC normal rate is below 5.7%, 5.7% to 6.4% indicates prediabetes, and 6.5% or more indicates diabetes.) As noted above, the CDC recognizes that diabetes, particularly if not well controlled, is a higher risk factor for Covid-19. To counter that risk, the CDC recommends that diabetics continue to take medication and track their blood sugar.

Murrey is not insulin dependent, and despite periods of non-compliance with and refusal of diabetes medication, he has managed to lower his A1C to either

normal or pre-diabetes risk levels, mostly through diet and exercise alone. Specifically, at a follow-up appointment a month after his diagnosis, Murrey admitted non-compliance with his diabetes medication, refused further medication, and instead chose to manage his condition conservatively through diet and exercise, despite counseling regarding the risks of uncontrolled diabetes in the absence of pharmacotherapy. Murrey nevertheless succeeded – his A1C tested at a normal level of 5.6 in July 2019, and pre-diabetic levels of 6.2 and 6.4 in October 2019 and July 2020, respectively. In August 2020, only after Murrey's diet and exercise options were limited by the Covid-19 lockdowns, did he ask to be placed on medication. (*See* Ex. 3, pp. 4, 6, 16-17, 19, 22-23, 27-28, 34-37, 60, 91, 94, 107-08; Ex. 4, pp. 19-25, 50, 53-57, 81, 105-06.)

When assessing Murrey's request for compassionate release based on his diabetes, the Court should consider the well-controlled nature of Murrey's diabetes at prediabetic levels as well as Murrey's choice to manage his condition through diet and exercise alone, against medical advice.

Murrey has also not demonstrated that his release would mitigate his risk of contracting Covid-19. Although the *average* person might have a higher risk of contracting or developing complications from Covid-19 in prison than if released, an *individual* defendant's risk varies widely. It depends on a long list of variables,

19

including the precautions at his prison, the number of Covid-19 cases there, the

prison's medical facilities, his access to medical care if released, and the threat

from Covid-19 at his release location. A defendant's risk of contracting Covid-19

also depends not just on his opportunities for social-distancing, but on his

willingness to take advantage of those opportunities and engage in social-

distancing for the pandemic's duration.

Murrey asserts that he is particularly vulnerable at his facility because there

is currently an outbreak of more than 150 active infections of Covid-19 on the

Yazoo City prison campus. (ECF No. 243, PageID.1369.) But there are three

facilities on the Yazoo City campus, and Murrey is housed at USP Yazoo City, at

which only 25 out of 1,208, or 2%, of its inmates have active infections. Moreover,

the BOP has screened and/or tested Murrey for Covid-19 at least five times and

placed him in quarantine as a precautionary measure prior to and after his recent

transfer to USP Yazoo City. (Ex. 4, pp. 5, 71-72, 101, 112.) BOP staff have acted

out of caution and concern for inmates, including Murrey.

Should Murrey be released, he intends to live at home with his wife and son.

He also has a job lined up at a real estate holdings company that has property

management and maintenance positions available. (ECF No. 243-2, PageID.1415.)

There is no indication, however, that this job would provide proper opportunities

20

for social distancing. This, combined with the recent uptick in Covid-19 cases in the community, decreases the likelihood that Murrey's release would mitigate his risk of contracting Covid-19.

**B. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.**

Even when an inmate has shown "extraordinary and compelling reasons," he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. 18 U.S.C. § 3582(c)(1)(A). A defendant's failure to establish that the § 3553(a) factors support relief is an independent basis for denying compassionate release. *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020); *accord United States v. Austin*, 825 F. App'x 324, 325–27 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors); *United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (same). So even if the Court were to find that Murrey established extraordinary and compelling reasons for his release, the § 3553(a) factors should still disqualify him.

For starters, Murrey's long remaining sentence weighs heavily against release. This Sixth Circuit has repeatedly upheld the denial of compassionate release under § 3553(a) when a defendant has a long remaining sentence, including in a recent published decision. *Ruffin*, 978 F.3d at 1008; *accord Kincaid*, 802 F.

21

App'x at 188–89; *Austin*, 825 F. App'x at 326; *see also United States v. Kincaid*, 805 F. App'x 394, 395–96 (6th Cir. 2020) ("[W]e don't think [the defendant] raises a close question."). This is because the original sentence already reflects the district court's evaluation of "the need to provide just punishment, the need to reflect the seriousness of the offense, and the need to promote respect for the law" under § 3553(a). *Kincaid*, 802 F. App'x at 188; *accord Ruffin*, 978 F.3d at 1008. Here, Murrey has over ten years remaining on his sentence, even when taking good time into consideration.  He has served about 8 years of a 21.6-year sentence.

The plain language of the compassionate-release statute makes the point even more directly: it requires that the defendant's reasons for release "warrant such a reduction" in his sentence. 18 U.S.C. § 3582(c)(1)(A)(i). That inquiry depends, at least in part, on the length of time remaining on the defendant's sentence, requiring him to justify the magnitude of his requested sentence reduction. *Id.* So a defendant with many years left on his sentence, like Murrey, must show that his reasons for release are so powerful that they "warrant" a "reduction" of that size. *Id.*

Moreover, the seriousness of Murrey's conduct cannot be overlooked. Murrey and his co-defendants trafficked more than 500 kilograms of cocaine into the Detroit area; Murrey stipulated that he was responsible for distributing at least

22

150 of those kilograms. *See United States v. Murrey,* 531 F. App'x at 655. In doing so, he preyed on some of the most vulnerable persons in our society – those suffering from drug addiction. As Murrey himself stated, he "poison[ed his] community." (ECF No. 243, PageID.1390.) But he didn't stop there. When faced with arrest, Murrey endangered the lives of law enforcement officers and the greater community as a whole when he deliberately sped away from the scene while an agent was holding on to his door, rammed into an agent's vehicle, and led agents on a high-speed chase through the streets of Detroit.

Furthermore, this was not Murrey's first rodeo. Murrey has a history of possessing and selling drugs that dates back to the 1990s, as evidenced by his multiple prior felony drug convictions. He was also previously convicted of fleeing and eluding police, leading them on a chase at speeds of over 100 miles per hour in 2004. Murrey's prior convictions did not deter him from committing the offenses for which he is currently incarcerated. Instead, he is a career offender, and his record shows that he will likely continue to sell drugs if released and, as such, create a danger to the public. Additionally, Murrey's willingness to evade the police at almost any cost when faced with arrest, further endangers the public.

Releasing only offenders who do not pose a danger to the public or present a significant risk of recidivism is especially important given the current strain on

society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Drug overdoses are skyrocketing. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

In addition, Murrey *already* received a sentence below the applicable Guidelines range of 292 to 365 months. Completion of his 260 months' prison sentence reflects the seriousness of Murrey's offenses and is needed to promote the respect for the law and provide a just punishment. Granting Murrey compassionate release at this point would lead to an unwarranted sentencing disparity, improperly minimize the seriousness of his drug trafficking offense, undermine the deterrent effect of such a prison sentence, and endanger the public. Therefore, the § 3553(a) factors independently bar his request for relief.

### C. The Court should decline Murrey's alternative request for a recommendation that he be granted home confinement.

The Court should also deny Murrey's alternative request for a judicial recommendation to the Bureau of Prisons that he finish his sentence under home

24

confinement. Even assuming the Court has the authority to grant such a

recommendation, Murrey is not a strong candidate for it. Namely, given the

lengthy amount of time remaining on Murrey's sentence, home confinement would

be impractical from both a supervision standpoint and a compliance standpoint.

## III.   If the Court were to grant Murrey's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Murrey's motion despite the

government's arguments above, the Court should order that he be subjected to a

14-day quarantine before release.

## Conclusion

Murrey's motion should be denied.

Respectfully Submitted,

MATTHEW SCHNEIDER
United States Attorney

*s/Corinne M. Lambert*
CORINNE M. LAMBERT
Special Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
Corinne.Lambert@usdoj.gov
(313) 226-9129

Date: December 14, 2020

25

**<u>Certificate of Service</u>**

I hereby certify that on December 14, 2020, I filed the foregoing electronically via the CM/ECF system, which will send notification of such filing to counsel of record:

Wade G. Fink
WADE FINK LAW PC
370 E. Maple Rd., Third Floor
Birmingham, Michigan 48009
(248) 712-1054
wade@wadefinklaw.com

<u>s/Corinne M. Lambert</u>
CORINNE M. LAMBERT

26